# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

BRANDON HARDY,

      Petitioner,

vs.                         Case No.:    3:14-cv-765-J-32JBT
                                                3:11-cr-119-J-32JBT

UNITED STATES OF AMERICA,

      Respondent.

_____/

## ORDER

      This case is before the Court on Petitioner Brandon Meredith Hardy's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. (Civ. Doc. 1).[1] The United States filed a response opposing relief. (Civ. Doc. 6). Petitioner did not file a reply. On November 1, 2016, the Court held an evidentiary hearing on Ground One of the Motion to Vacate. (Civ. Doc. 8). Pursuant to Rule 8(a) of the Rules Governing Section 2255 Proceedings, the Court has determined that an evidentiary hearing is not necessary with respect to Grounds Two and Three. See Aron v. United States, 291 F.3d 708, 714–15 (11th Cir. 2002) (an evidentiary hearing on a § 2255 petition is not required when the petitioner asserts allegations that are affirmatively contradicted by the record or patently frivolous, or if in assuming that the facts he

---

[1] Citations to the record in the underlying criminal case, United States vs. Brandon Meredith Hardy, Case No. 3:11-cr-119-J-32JBT, will be denoted as "Crim. Doc. __." Citations to the record in the civil § 2255 case, Case No. 3:14-cv-765-J-32JBT, will be denoted as "Civ. Doc. __."

alleges are true, he still would not be entitled to any relief). For the reasons set forth below, Petitioner's Motion to Vacate is due to be denied.

## I.    Background

On May 24, 2011, a grand jury indicted Petitioner on one count of attempting to persuade, induce, entice, or coerce a person whom he believed to be a minor to engage in sexual activity constituting a criminal offense, in violation of 18 U.S.C. § 2422(b). Petitioner pled not guilty and proceeded to a jury trial.

Petitioner's trial lasted from March 6, 2012 to March 8, 2012. During the trial, the government presented evidence that Petitioner was on a teen-chat website when he initiated contact with an undercover officer whom Petitioner believed to be a 12-year old boy named "Paul." See United States v. Hardy, 520 F. App'x 835, 836 (11th Cir. 2013). Through a series of conversations, Petitioner described engaging in various sexual activities with "Paul" in graphic detail. Id. Petitioner "often suggested sexual activities without any encouragement from Paul," and he repeatedly told "Paul" that the sexual activity would make "Paul" "feel good" and be "a lot of fun." Id. at 838. During their conversations, Petitioner stated that if they met, he would bring lubricant and a picture to arouse "Paul." See id. Five days after initiating contact with "Paul" online, Petitioner drove from Georgia to an address in St. Augustine, Florida, which Petitioner thought to be Paul's home. Id. at 836. There, law enforcement officers were waiting for Petitioner and placed him under arrest. Petitioner had in his possession both an image of an adult male sexually abusing a

prepubescent boy and strawberry-flavored lubricant, both of which Petitioner had discussed in his online conversations.  See id. at 838.

Petitioner did not put on a case of his own.  However, through cross-examining the government's witnesses, the recording of a post-arrest interview between Petitioner and police, and closing argument, Petitioner countered that he did not intend to entice "Paul" to engage in sexual activity.  (See, e.g., Crim. Doc. 89 at 183-87; Crim. Doc. 90 at 54-68).  Rather, Petitioner argued that during his online conversations with "Paul," he was merely playing out sexual fantasies, but he did not intend to follow through with them.  Petitioner argued that, although he drove several hours to meet "Paul," he did not have the nerve to engage in sexual activity with the boy, but instead would only have socialized with "Paul" and taken him out for a meal.

The jury did not accept Petitioner's defense.  After deliberating for a little over two hours, the jury returned a verdict of guilty.  (See Crim. Doc. 65; Crim. Doc. 90 at 96-97).

After trial, and a few days before sentencing, the United States disclosed that it had come into possession of certain letters that Petitioner had written while he was in pretrial detention.  In the letters, Petitioner made statements that were consistent with the defense's theory that he lacked intent to act upon his sexual fantasies.  (See Civ. Doc. 6 at 11-13; Crim. Doc. 70; Crim. Doc. 91 at 2-5).  Petitioner's trial counsel moved to continue the sentencing hearing to investigate whether the newly-disclosed letters warranted filing a motion for a new trial, pursuant to Rule 33(b)(1), Federal Rules of Criminal Procedure, and Brady v. Maryland, 373 U.S. 83 (1963).  After

investigating, counsel concluded that the letters did not provide grounds to move for a new trial, because (1) the United States disclosed the letters almost as soon as it became aware of them, (2) the letters would not have been admissible at trial anyway unless Petitioner testified, and even then, the letters would only have been admissible to rebut an allegation that Petitioner had recently fabricated his testimony, and (3) in any event, Petitioner himself was aware of the letters because he was the one who wrote them. (See Crim. Doc. 70 at 2). Therefore, trial counsel notified the Court that he would not be filing a motion for a new trial.

Accordingly, the Court moved forward with sentencing on July 24, 2012. (See Crim. Doc. 91). The Court sentenced Petitioner to a term of 120 months in prison, which was the mandatory minimum set forth under 18 U.S.C. § 2422(b). (Crim. Doc. 91 at 29; Crim. Doc. 74).

Petitioner filed a timely notice of appeal. (Crim. Doc. 76). On direct review, the Eleventh Circuit Court of Appeals affirmed Petitioner's conviction and sentence. (Crim. Doc. 102); Hardy, 520 F. App'x at 840. Petitioner did not petition the Supreme Court for a writ of certiorari. Petitioner timely filed the current Motion to Vacate.

## II.    Petitioner's Motion to Vacate

Petitioner raises three grounds in his Motion to Vacate, all of which involve the alleged ineffective assistance of counsel. First, Petitioner contends that counsel was ineffective because he refused to accept Petitioner's decision to testify. (Civ. Doc. 1 at 4). Second, Petitioner argues that counsel was ineffective for failing to move for a new trial based on the United States' disclosure of Petitioner's own letters a few

days before sentencing. (Id. at 5). Third, Petitioner argues that counsel was ineffective for not presenting witnesses or evidence concerning Petitioner's mental health, psychosexual therapy, and psychosexual evaluation at the jury trial. (Id. at 7). In Ground Three, Petitioner also argues that counsel was ineffective for not seeking a mental health jury instruction, although he does not specify what that instruction would have been. (Id.).

### III.   Discussion

Pursuant to Title 28, United States Code, Section 2255, a person in federal custody may move to vacate, set aside, or correct his sentence. Section 2255 permits such collateral challenges on four specific grounds: (1) the imposed sentence was in violation of the Constitution or laws of the United States; (2) the court did not have jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack. 28 U.S.C §2255(a) (2008). Only jurisdictional claims, constitutional claims, and claims of error that are so fundamental as to cause a complete miscarriage of justice will warrant relief through collateral attack. United States v. Addonizio, 442 U.S. 178, 184-86 (1979). A petitioner's challenge to his sentence based on a Sixth Amendment claim of ineffective assistance of counsel is normally considered a collateral attack. United States v. Teague, 953 F.2d 1525, 1534 n. 11 (11th Cir. 1992).

To succeed on a claim of ineffective assistance of counsel, a petitioner must show both (1) that counsel's performance was deficient, and (2) that as a result of counsel's deficient performance, the petitioner suffered prejudice. Strickland v.

Washington, 466 U.S. 668, 687 (1984). In determining whether counsel performed deficiently, the Court adheres to the standard of reasonably effective assistance. Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994). The petitioner must show, in light of all the circumstances, that counsel's performance fell outside the "wide range of professionally competent assistance." Id. There is a "strong presumption in favor of competence, [and] the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one." Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000). When trial counsel is experienced, the presumption of competence is even greater. Id. at 1316.

To show that counsel's deficient performance prejudiced the defendant, the petitioner must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Id. at 1036-37 (citing Strickland, 466 U.S. at 694). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694. However, "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011).

In determining whether a petitioner has met the two prongs of deficient performance and prejudice, the Court considers the totality of the evidence. Id. at 695. However, because both prongs are necessary, "there is no reason for a court… to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697; see also Wellington v. Moore, 314 F.3d 1256, 1261 n. 1 (11th Cir. 2002) ("We need not discuss

the performance deficiency component of [petitioner's] ineffective assistance claim because failure to satisfy the prejudice component is dispositive.").

## A. Ground One: Whether counsel denied Petitioner the right to testify

Petitioner asserts that counsel gave ineffective assistance because he told counsel he wanted to testify, but counsel refused to accept Petitioner's decision to do so. (Civ. Doc. 1 at 4). Petitioner states that during pretrial discussions, he "expressed [to counsel] his desire to testify." (Id.). "Counsel told petitioner that if he testified he could be subjected to cross-examination but, nevertheless, petitioner affirmatively expressed his strong desire to testify to counsel." (Id.). "Despite petitioner's demand to testify," Petitioner continues, "counsel refused to accept petitioner's decision and did not call him, essentially waiving petitioner's right to testify without permission." (Id.).

In an affidavit attached to the Motion to Vacate, Petitioner sets forth twelve points he would have testified to on direct examination. (Id. at 15-17). The essence of Petitioner's proffered testimony is that he did not intend to have sex with "Paul."

The Court held an evidentiary hearing on this allegation on November 1, 2016. (Civ. Doc. 8). The Court heard testimony from Petitioner and his trial counsel, A. Russell Smith. The Court also received two exhibits, one each from Petitioner and the United States. (Civ. Doc. 8-1; Civ. Doc. 8-2). Based on the applicable law and the testimony adduced at the hearing, the Court concludes that trial counsel did not perform deficiently with respect to Petitioner's right to testify.

A defendant has a constitutional right to testify in his own behalf. <u>Rock v. Arkansas</u>, 483 U.S. 44, 51-53 (1987). That right is personal and fundamental; it cannot be waived by either the court or trial counsel, but only by the defendant. <u>Teague</u>, 953 F.2d at 1532. Indeed, the defendant is the one "who above all others may be in a position to meet the prosecution's case." <u>Ferguson v. Georgia</u>, 365 U.S. 570, 582 (1961).

The "trial court has no <u>sua sponte</u> duty to explain to a criminal defendant that he has a right to testify or to conduct an on-the-record inquiry into whether a defendant [who] is not testifying has waived the right knowingly, voluntarily, and intelligently." <u>United States v. Van De Walker</u>, 141 F.3d 1451, 1452 (11th Cir. 1998) (citations omitted). The Eleventh Circuit has opined that it "would be inappropriate to require the trial court to discuss this choice with the defendant" because "[s]uch a requirement would unnecessarily intrude into the attorney-client relationship and could unintentionally influence the defendant in his or her choice." <u>Id.</u> (quoting <u>Teague</u>, 953 F.2d at 1533 n.8).[2]

Instead, "the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel under <u>Strickland</u>...." <u>Teague</u>, 953 F.2d at 1534.

> Where the defendant claims a violation of his right to testify by defense counsel, the essence of the claim is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not

---

[2] There can be, however, "exceptional, narrowly defined circumstances" that require a district court to conduct a colloquy with a defendant about the right to testify. <u>Van De Walker</u>, 141 F.3d at 1452 n.2; <u>United States v. Hung Thien Ly</u>, 646 F.3d 1307, 1317 (11th Cir. 2011).

to testify in his own behalf. In other words, by not protecting the defendant's right to testify, defense counsel's performance fell below the constitutional minimum, thereby violating the first prong of the <u>Strickland</u> test. For example, if defense counsel refused to accept the defendant's decision to testify and would not call him to the stand, counsel would have acted unethically to prevent the defendant from exercising his fundamental constitutional right to testify. Alternatively, if defense counsel never informed the defendant of the right to testify, and that the ultimate decision belongs to the defendant, counsel would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected and that any waiver of that right is knowing and voluntary.

<u>Id.</u>

<u>Teague</u> "delineated the duties of a trial counsel with respect to a defendant's right to testify. Counsel must advise the defendant (1) of his right to testify or not testify; (2) of the strategic implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify." <u>McGriff v. Dep't of Corrections</u>, 338 F.3d 1231, 1237 (11th Cir. 2003) (citing <u>Teague</u>, 953 F.2d at 1533). Counsel gives ineffective assistance with respect to the defendant's right to testify where counsel "has refused to accept the defendant's decision to testify and refused to call him to the stand, or where defense counsel never informed the defendant of his right to testify and that the final decision belongs to the defendant alone." <u>Gallego v. United States</u>, 174 F.3d 1196, 1197 (11th Cir. 1999).

While the decision to testify is the defendant's alone, an attorney does not render ineffective assistance by strategically advising a defendant not to take the stand. "[I]f defense counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify." <u>Teague</u>, 953 F.2d at 1533; <u>see also</u> <u>United States v. Willis</u>, 273

F.3d 592, 598 (5th Cir. 2001) (counsel could reasonably advise defendant not to testify out of concern that he would be impeached with prior convictions under Fed. R. Evid. 609).

At the evidentiary hearing, the Court heard Petitioner's testimony first. (Civ. Doc. 9 at 6-40). Petitioner recalled that he met several times with counsel before trial to review and discuss the evidence. (Id. at 7-8, 17-18). At one point, Petitioner and counsel had a meeting where Petitioner decided – against counsel's advice – to decline a plea offer and proceed to trial. (Id. at 8-9).[3] Once Petitioner made that decision, the conversation turned to whether he should take the stand. (Id. at 10-11). Petitioner stated that he "expressed [his] desire to testify" to counsel, and that he "made it very clear [he] wanted to testify… throughout the whole process." (Id. at 11). Petitioner recalled that counsel was "reluctant" and did not want Petitioner to do so. (Id.). Trial counsel took Petitioner through a "mock cross examination" to illustrate what might happen if Petitioner took the stand. (See id. at 12). By Petitioner's own account, the mock cross-examination went poorly. Petitioner was almost in tears and "emotionally distraught" by the end of it. (Id. at 12-13). Petitioner recalled that at the end of the mock cross-examination, he did not express the desire to testify. (Id.). In fact, he never brought up the subject again. (Id. at 13). Nevertheless, Petitioner testified that he maintained the "attitude" that he wanted

---

[3]     Trial counsel had Petitioner sign a hand-written document, which reflected that they had reviewed the evidence together; that counsel had explained the plea offer; that Petitioner was aware that "the government ha[d] sufficient evidence to satisfy each of the elements of the offense"; and that Petitioner still wished to proceed to trial. (Civ. Doc. 8-1).

to testify.  (Id.).  Petitioner stated that he never addressed counsel about the right to testify during the trial, but he explained that it was because he "was under the impression that it was [counsel's] call" to make.  (Id. at 13-14).  Petitioner explained that he did not know that whether to testify was his own decision to make, and that counsel never advised him that it was ultimately up to him.  (Id. at 14-16).  Petitioner insisted that had he known it was his personal decision to make, he would have taken the stand.  (Id. at 14).

On cross-examination, Petitioner testified further about what happened after the mock cross-examination.  He testified as follows:

Q:    Okay.  And you said that Mr. Smith – let me make sure I get it right, that you were – you said that you were in a fragile emotional state.  And – and after that, that's when you felt like the decision that you weren't going to testify was made?

A:    It – that's when it was understood – or that's – as far as I'm concerned – or as far as he was concerned, yes, that's what – when he thought that the issue was settled.

Q:    Okay.  And so you think that he was impressed maybe in a negative way by your performance during the mock cross-examination?

A:    Yes.

Q:    And that he, based on his experience as a trial lawyer, didn't think it was a good idea for you to testify?

A:    Yes.

Q:    And you agreed or disagreed at that time?

A:    It was never – I never – we never formally discussed it.  It was never an expression, Okay, I understand what you're saying, I – I'm not going to testify.

It was – we had the discussion, he had the mock cross-examination, and I got, you know, agitated. And it was sort of like, Okay. Well, you see, look at you there. That's – I mean, not – not physically said, but, I mean, you know, to – it was – the motion was – it was understood.

I mean, you know, it wasn't physically communicated, but, you know, it was implied that – like you said, I performed negatively, and that obviously – why would you want to put yourself in this situation when you can't even do it here?

Q:     And so you implied to him that you didn't want to testify –

A:     No.

Q:     – by your conduct? Because you said it was implied. I'm just trying to understand what you mean.

A:     Well, as far – well, I'm saying that from his perspective, obviously – it was understood by him that the issue of whether or not I was going to testify would be something that we don't need to discuss any further.

It wasn't anything that we said, Okay, yes, we're going to – all right, Mr. Smith, I agree with you. Or it wasn't, Mr. Hardy, so do you understand what I'm saying?

Now, do you still not – what's your – would you like to testify or not, having – you know, you see what just happened. Do you still want to testify? It was – none of that happened. It wasn't like that.

Q:     So do you, sitting here today, think it was reasonable for him to assume that based on your performance you didn't want to testify?

***

A:     I mean, I don't think so. No, it's not really reasonable. …

(Civ. Doc. 9 at 29-31). Thus, Petitioner seemed to testify that he knew counsel was under the impression that he would not, and should not, take the stand, but that counsel was unreasonable to conclude that Petitioner did not wish to testify.

Petitioner did not explain why, if he knew counsel was under the impression that he was not going to testify, he did not speak up after the mock cross-examination to correct counsel's misunderstanding. (See id. at 12-13).

Petitioner also recalled that he said nothing to counsel about wanting to testify during the trial, even as he heard the Court and the attorneys mention that the defense would not put on a case, and the Court discussed issuing the jury instruction applicable in cases where the defendant chooses not to testify. (Id. at 33-35); (accord Crim. Doc. 89 at 230-31; Crim. Doc. 90 at 15-16, 40-41).

The United States impeached Petitioner's credibility based on inconsistencies between Petitioner's testimony and the allegations in the Motion to Vacate. (Civ. Doc. 9 at 35-39).[4] The United States pointed out that during the hearing, Petitioner testified that (1) he told counsel he wanted to testify, (2) he and counsel went through a mock cross-examination, and (3) after his poor performance, Petitioner never brought up the issue of testifying again. (Civ. Doc. 9 at 35-36; see also id. at 12-13). In the Motion to Vacate, however, Petitioner alleged that (1) he told counsel he wanted to testify, (2) "[c]ounsel told petitioner that if he testified he would be subjected to cross-examination" (Civ. Doc. 1 at 4), which was a reference to the mock cross-exam exercise (Civ. Doc. 9 at 36); and (3) "nevertheless, petitioner affirmatively

_____

[4]     The United States also highlighted an inconsistency between (1) the transcript of a post-arrest interview between Petitioner and law enforcement, where he seemed to admit that he traveled from Georgia to Florida with the intent to have sex with "Paul" (Government's Trial Exhibit 13A at 19-20), and (2) Petitioner's insistence that he would have testified that he lacked intent to have sex with the minor. (Civ. Doc. 9 at 22-28).

expressed his strong desire to testify to counsel," (Civ. Doc. 1 at 4) (emphasis added). Petitioner acknowledged that the allegation was inconsistent with his testimony about what happened. (Civ. Doc. 9 at 36-37). Petitioner still maintained that, overall, he had demanded to testify. (Id. at 37-38).

Next, the Court heard testimony from Petitioner's trial counsel, A. Russell Smith. (Id. at 41-65). Counsel testified that he has been practicing law since 1980. (Id. at 41). Counsel initially spent three years as an assistant public defender before opening his own practice in 1983. (Id.). Since then, counsel estimates that he has devoted 60-65% of his practice to criminal defense (id.), and he has participated in about 50 jury trials (id. at 58). Counsel has been a member of the Court's CJA panel for 32 years, and he served as president of the Florida Association of Criminal Defense Lawyers for the 2006-07 year. (Id. at 42).

Counsel recalled the Court appointing him to represent Petitioner. Counsel testified that, while he and Petitioner were not "close," they communicated freely and there was no animosity or "difficulty to speak of between" them. (Id. at 43-44). Indeed, Petitioner often sent letters to counsel, titled "investigative reports," where Petitioner would discuss trial strategy. (Id. at 44-45). Counsel did not recall Petitioner ever demanding to testify, either in those letters or otherwise. (Id. at 45-46, 55). Counsel did recall discussing the strategic implications of whether to have Petitioner take the stand:

Q:    Did [Petitioner] ever suggest that he wanted to testify?

A:    I don't know if he was the first to suggest it or if I was, but early in the case we essentially decided that he wanted to go to trial.

And then the question became, Do you testify or not? And so over the course of several meetings, we would discuss benefits and liabilities of testifying at trial.

There were risks involved with his testimony. I was not – I didn't believe he would be able to – I didn't think he would come across as sympathetic to the jury. I didn't think he would be able to – he had a certain amount of – I wouldn't say temper, but he felt a certain amount of animus towards the officers who had arrested him and the way he had been arrested. He felt that he had been entrapped.

And I felt that that would come across as angry and unrepentant to a jury. I wasn't comfortable with that. But, essentially, the deciding factor was – during a series of meetings, we went over what his testimony would be and compared it to the elements of the offense.

And in every case his testimony would result, at least through cross-examination, of him admitting each and every element of the offense.

(<u>Id.</u> at 46). Counsel continued:

Q:     Okay. All right. … let me ask you this. Did you ever engage in any type of mock cross-examination with [Petitioner], where you sort of played the prosecutor, and sort of rapid-fire questioned him to see how he would do under that type of stress?

A:     I did not conduct a mock cross-examination, but what we did do is conduct an exercise, essentially, where we discussed a particular element.

And I would say, What would your testimony be about this? Well, if you're going to testify about – this way about that at this time, how are we going to explain this –

Q:     Okay.

A:     – or, What are we going to do about the fact you said something different to the police? Or – it was in the nature of that type of give-and-take, rather than a mock cross-examination.

(<u>Id.</u> at 47-48).

The United States referred to Government's Exhibit 1 (Civ. Doc. 8-2), a handwritten document that contained counsel's assessment as to whether Petitioner had a defense for each element of the offense. The direct examination continued as follows:

Q:   And you gave me that before the hearing. And can you explain briefly to the court what that is? …

A:   I understand. The – our discussions about his testimony were could – would it benefit him or would it – would it not benefit him? Would it be to his detriment?

And so over the course of several meetings, we fleshed that out. This was an exercise we did at – when we made the final decision that he would not testify.

And what we did is listed all of the elements of the offense with which he was charged, discussed each element. And when we got to the point where he would concede that he – that the government had the evidence to prove it and he could not rebut that evidence in his direct testimony, I would write "no defense." And that's – we went through each individual element. And that was what the top two-thirds of that paper were.

Q:   And – and is it your testimony here today that when you wrote "no defense" that you both agreed upon that, or was that your conclusion?

In other words, was there unanimity between the two of you on each of those findings? Or was it your ultimate legal opinion?

A:   It was unanimity in our decision. There – he asked me for guidance and my opinion, which I freely gave him. It was a give-and-take. I didn't push him into anything. There were specific areas about which he was concerned about testifying.

Part of our discussion was the fact that there were possibilities that those areas that he did not want to discuss would come up in cross-examination. So it wasn't as if he had to be convinced not to

testify.  He was vacillating about whether or not it was in his best interest.

So this was essentially part of an ongoing analysis of whether it was in his best interest or not.  And we reached the conclusion together that he really couldn't take the stand.

(Id. at 48-50).

Counsel went on to testify that he informed Petitioner that he had the right to testify:

Q:    Okay.  Did he – did he – did you explain to him or notify him or tell him that it was his right to testify?

A:    Absolutely.

Q:    Okay.

A:    I tell all of my clients the same thing.  I say, You have the right not to testify or you have the right to tell the truth.  You don't have the right to lie.  So our two options are "don't testify" or "tell the truth."  That's how I initially present it to every one of my clients.

Q:    And that's the way you've been doing it for the last – a long time, 30-plus years?

A:    Well, probably not initially, but it's what I've developed as a way to make it absolutely clear that we don't play around with the truth.

Q:    Right.  I understand.

Okay.  And did he ever indicate to you any uncertainty on – about whether he understood his right to testify?

A:    I'm sure at points during our various discussions he was unsure about whether he wanted to testify or not.  But by the point at which we wrote this up [Government's Exhibit 1], at the point at which we went to trial, he was committed to the idea he did not want to take the stand.

Q:     Okay.  And that's good testimony you just gave, but my question
       – it didn't quite answer my question.

       …

       My question was:  Was there ever any concern that you had that
       he didn't understand his right to testify?

A:     Oh, I'm sorry.  No.  He always understood that he had a right to
       testify.

(Id. at 50-51).

Counsel recalled that, during the course of the trial, Petitioner did not ask to take the stand.  (Id. at 53).  During a brief conference while the Court and the parties were discussing jury instructions (see Crim. Doc. 90 at 25), counsel momentarily "stopped and confirmed" that Petitioner did not want to testify.  (Civ. Doc. 9 at 53-54). Counsel also searched his file for an outline of a direct examination for Petitioner, which he could not find.  (See id. at 54-56).  Based on his normal practices, the absence of such an outline indicated to counsel that he and Petitioner had settled well before trial that Petitioner would not testify.  (Id. at 56; see also id. at 63-64).

 Counsel denied that he tried to prevent Petitioner from exercising his right to testify:

Q:     Did you ever tell the defendant that he could not testify at trial?

A:     Absolutely not.

Q:     Did you ever ask – tell him that you would not allow him to testify
       at trial?

A:     Absolutely not.

Q:     Did you ever say or do anything that was designed to force him
       not to testify at trial?

18

A:     Absolutely not.

Q:     Did you ever take any actions to usurp or to override his right to testify or not to testify at trial?

A:     Frankly, I wouldn't know how you would do that. I mean, if your client wants to testify, I think about the worst thing you can do during a trial is try and prevent it.

       If a client is determined to testify, your duty as his lawyer, first of all, is to advise him of the pitfalls of it, but if he insists, to put him up there and take him through it, consistent with the Code of Professional Responsibility and the evidence, and let him testify.

       I can't think of a worse situation to have in front of a jury than to be urging your client to, Be quiet, leave me alone, don't ask again, that kind of thing. It wouldn't go well.

Q:     And your testimony is – it appears to be that that didn't happen in this case?

A:     That did not happen.

(Id. at 54-55).

On cross-examination, counsel confirmed that it was his custom to advise clients that they had the right to testify (id. at 59), and furthermore, that it is their decision alone to make:

Q:     Okay. In Mr. Hardy's situation, do you recall specifically saying to Mr. Hardy that the decision to testify is yours and yours alone?

A:     I don't recall a specific statement like that to Mr. Hardy, but that is a statement I make to all of my clients. So I would expect that I did.

Q:     And do you recall whether you said to Mr. Hardy, That means, Mr. Hardy, that if I tell you that I don't think it's a good idea that you testify, but you say that you want to, you win, you get to testify? Do you think you had that kind of –

A:      I'm sure we had – I don't know that I would have used those
        words, but I'm sure we had that type of conversation.

(Id. at 59).

Regarding counsel's testimony that he and Petitioner decided in advance that Petitioner would not testify, counsel acknowledged that there are occasions where that decision might need to change mid-trial. (Id. at 58). Counsel testified, however, that that decision did not change during the course of Petitioner's trial, as Petitioner never requested to testify. (Id. at 60-61).

Based on the evidence adduced at the hearing, the Court finds that trial counsel was the more credible witness. After carefully observing his demeanor on the stand and examining the content of his testimony, he impressed the Court as a witness who was telling the truth. His recollection of events made sense, and overall, his testimony was internally consistent. Moreover, counsel lacks a substantial interest in the outcome of these proceedings, so he has little motive to be untruthful.

By contrast, Petitioner did not impress the Court as a witness who was telling the truth. For instance, Petitioner's testimony at the hearing was inconsistent with the allegations in his own Motion to Vacate. (See id. at 35-39). Petitioner alleged in his sworn § 2255 motion that he "affirmatively expressed his strong desire to testify" even after counsel advised him about cross-examination. (Civ. Doc. 1 at 4). At the hearing, however, Petitioner testified that after counsel ran him through the "mock cross-examination," he never again asked about testifying. (Civ. Doc. 9 at 12-13, 35). When confronted with the inconsistency, Petitioner acknowledged that the Motion to Vacate was inaccurately worded. (Id. at 36-39). Moreover, despite initially insisting

at the hearing that he "made it very clear [he] wanted to testify … throughout the whole process" (<u>id.</u> at 11), Petitioner admitted that he never asked again about testifying after the mock cross-examination (<u>id.</u> at 12-13). Thus, Petitioner's testimony is not internally consistent.

Additionally, Petitioner's recollection of events does not make sense. Petitioner testified that after he performed poorly on the mock cross-examination, it was "understood" or "implied" that he would not testify. (<u>Id.</u> at 29-30). At the same time, Petitioner insists that he still wanted to testify, yet he said nothing further about it. (<u>Id.</u> at 12-14). If Petitioner still wished to testify, and he knew counsel was under the impression that he did not want to do so, it makes little sense for Petitioner to have said nothing to correct counsel's alleged misunderstanding. Thus, Petitioner's actions and testimony are not consistent with a defendant who wished to testify.

Having determined that counsel was the more credible witness, the Court finds that, based on counsel's testimony, counsel did not perform deficiently. Counsel's duties regarding a defendant's right to testify are to "advise the defendant (1) of his right to testify or not testify; (2) of the strategic implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify." <u>McGriff</u>, 338 F.3d at 1237 (citing <u>Teague</u>, 953 F.2d at 1533). Counsel fulfilled each of those duties. Counsel (1) advised Petitioner of the right to testify or not (Civ. Doc. 9 at 50, 59); (2) advised Petitioner, through a series of meetings, of the strategic implications of each choice (<u>id.</u> at 45-50); and (3) advised Petitioner that it was ultimately for Petitioner himself to decide whether or not to testify (<u>id.</u> at 59). Although counsel did

not recall specifically advising Petitioner that whether to testify was his decision alone, he did testify that such advice is part of what he tells all of his clients, and he expects that he had the same discussion with Petitioner. (Id.). As such, the Court concludes that, more likely than not, counsel adhered to his normal practices in this case, and he advised Petitioner that whether to testify was Petitioner's decision alone. See McGriff, 338 F.3d at 1237-38 (when counsel states it was her "ordinary practice" to advise clients of the right to testify, the district court does not clearly err in finding it "more likely than not" that counsel so advised the client); Teague, 953 F.2d at 1527-28, 1535 (when counsel testified that it was her "normal practice" to discuss the right to testify and that she "probably" had explained this right to the defendant, the district court did not err in finding that defendant failed to show ineffectiveness of counsel); Reynolds v. United States, 233 F. App'x 904, 905 (11th Cir. 2007) ("[T]he court did not clearly err in finding that his attorney provided credible testimony that she was an experienced trial attorney whose 'general practice' was to appraise defendants of their right to testify, to advise them whether to testify, and to allow them to make the ultimate decision.").

Conversely, counsel gives ineffective assistance with respect to the defendant's right to testify where (1) counsel refuses to accept the defendant's decision to testify and refuses to call him to the stand, or (2) counsel never informs the defendant of his right to testify, and that the final decision belongs to the defendant alone. Gallego, 174 F.3d at 1197. Counsel credibly testified that Petitioner did not request to testify, and that he and Petitioner reached a joint decision that Petitioner should not take

the stand.  (<u>E.g.</u>, Civ. Doc. 9 at 48-50, 56-57).  Thus, counsel did not refuse a decision by Petitioner to testify.  Moreover, as discussed above, counsel informed Petitioner of his right to testify, and that the final decision belongs to him alone.  (<u>Id.</u> at 49-50, 59).

Accordingly, the Court finds that counsel competently discharged his responsibility to advise Petitioner about the right to testify and to honor Petitioner's final decision.  As such, counsel did not render deficient performance under <u>Strickland</u>.  Because a petitioner is required to prove both deficient performance and prejudice, the Court need not reach the prejudice prong.  <u>See</u> <u>Strickland</u>, 466 U.S. at 697.  Relief on Ground One is due to be denied.

## B. Ground Two:  Whether counsel gave ineffective assistance by failing to move for a new trial

Petitioner claims that counsel was ineffective for failing to move for a new trial after it came to light that the United States possessed several letters that Petitioner wrote while in pretrial detention.  (Civ. Doc. 1 at 5).  The Court and the attorneys explored this issue in the criminal case, and the Court determined that counsel had discharged his duty to investigate the matter before he decided that the letters did not provide a basis for moving for a new trial.

A few days before sentencing, the United States disclosed that it had come into possession of five letters that Petitioner had written while he was in pretrial detention.  (<u>See</u> Crim. Doc. 91 at 4).  In the letters, Petitioner made statements that were consistent with his trial theory that he lacked intent to act upon his sexual fantasies with "Paul."  (<u>See</u> Civ. Doc. 6 at 11-13; Crim. Doc. 70; Crim. Doc. 91 at 3). Petitioner's trial counsel moved to continue the sentencing hearing to investigate

whether the newly-disclosed letters warranted filing a motion for a new trial, pursuant to Rule 33(b)(1), Federal Rules of Criminal Procedure, and <u>Brady</u>. (<u>See</u> Crim. Doc. 70; Crim. Doc. 91 at 2-5). After investigating, counsel concluded that the letters did not provide grounds to move for a new trial, because (1) the United States disclosed the letters almost as soon as it came into possession of them, (2) the letters would not have been admissible at trial anyway unless Petitioner testified, and even then, the letters would only have been admissible to rebut an allegation that Petitioner had recently fabricated his testimony, and (3) Petitioner himself was aware of the letters because he wrote them. (<u>See</u> Crim. Doc. 70 at 2; <u>see also</u> Crim. Doc. 91 at 3-4). Therefore, trial counsel notified the Court that he would not be filing a motion for a new trial.

After trial counsel and the prosecutor summarized the results of their investigation, the Court concluded that it was

> satisfied that Mr. Smith, as Mr. Hardy's attorney, has done what he would be required to do to investigate the circumstances of these late-discovered letters.
>
> And I'm satisfied – if Mr. Smith has found no legal basis to either move for a new trial or to seek any other relief, I'm satisfied that he's discharged his obligations. And I'm further satisfied that there's no impediment to moving towards sentencing today.

(Crim. Doc. 91 at 4-5). Petitioner raised no objection at that time to counsel not filing a motion for a new trial.

The record demonstrates that trial counsel investigated the possibility of moving for a new trial based on the newly-disclosed letters, but that he had a reasoned legal basis for not doing so. (<u>See</u> Crim. Doc. 70; Crim. Doc. 91 at 3-4). In

order to have established a <u>Brady</u> violation based on the letters, counsel would have had to show: (1) that the prosecution possessed evidence favorable to the defendant; (2) that the defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. <u>United States v. Bailey</u>, 123 F.3d 1381, 1397 (11th Cir. 1997). The fact that Petitioner himself wrote the letters meant that the defendant possessed the evidence and he could have obtained it with reasonable diligence. The fact that the prosecution disclosed the letters to trial counsel almost as soon as it came into possession of them reflects that the United States did not suppress the evidence. Finally, trial counsel's opinion that the "evidentiary value [of the letters] was significantly attenuated" (Crim. Doc. 91 at 3-4) suggests that there is not a reasonable probability the letters would have affected the outcome of the proceedings.

Thus, the Court finds that counsel had no basis for filing a motion for a new trial, and as such, he did not perform deficiently. <u>See</u> <u>Meeks v. Moore</u>, 216 F.3d 951, 968 (11th Cir. 2000) (affirming district court's decision that counsel has no duty to bring forth non-meritorious motions); <u>Ladd v. Jones</u>, 864 F.2d 108, 110 (11th Cir.1989) ("[S]ince these claims were meritless, it was clearly not ineffective for counsel not to pursue them."). Relief on Ground Two is therefore due to be denied.

**C. Ground Three:  Whether counsel gave ineffective assistance by failing to present mental health evidence, or request a mental health jury instruction, at the jury trial**

Finally, Petitioner contends that counsel was ineffective during the jury trial – not the sentencing hearing – for failing to call two mental health professionals who counseled him for psychosexual issues, for failing to present evidence of a psychosexual evaluation, and for failing to request a mental health jury instruction. (Civ. Doc. 1 at 7).  Petitioner alleges that counsel "failed to fully investigate and present these mental health-related issues to the Court…." (Id. at 18).  In the Motion to Vacate, however, Petitioner alleges that after he underwent a psychosexual evaluation, "counsel expressed to petitioner that counsel was of the opinion that the findings of the evaluation did not produce any helpful evidence." (Id. at 7).  Despite counsel's opinion, Petitioner states that he wanted "the mental health-related evidence [to] be presented to the jury for their consideration and determination." (Id.).

This ground does not merit relief.  "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (citing Solomon v. Kemp, 735 F.2d 395, 404 (11th Cir. 1984)).  Contrary to Petitioner's allegation that counsel failed to investigate, Petitioner's statement that counsel opined that the psychosexual evaluation did not provide any helpful evidence reflects that counsel considered the mental health evaluation, and made a strategic decision not to present it. (See Civ. Doc. 1 at 7).  Because "[c]ounsel will not be deemed unconstitutionally deficient because of tactical decisions," Michael v. Crosby, 430

F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>McNeal v. Wainwright</u>, 722 F.2d 674, 676 (11th Cir. 1984)), the Court will not find that counsel was deficient for strategically choosing not to present evidence or testimony regarding Petitioner's psychosexual treatment and evaluation.

Additionally, Petitioner has failed to adequately allege prejudice. Petitioner fails to explain what the testimony or evidence concerning his psychosexual therapy and treatment would have revealed, for what purpose he would have used such mental health evidence, or why such evidence would have altered the jury's guilty verdict. Petitioner also fails to explain what kind of mental health jury instruction counsel should have pursued, or why there is a reasonable probability that such an instruction would have caused the jury to find him not guilty. (<u>See</u> Civ. Doc. 1 at 7, 17-18).

A petitioner is not entitled to an evidentiary hearing, much less habeas relief, when his claims are merely conclusory allegations unsupported by specifics, or if the allegations fail to state a claim for relief. <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1559 (11th Cir. 1991) (citations omitted). Because Petitioner fails to describe what mental health evidence or mental health jury instruction counsel should have pursued, and why it would have been relevant to the determination of his guilt, Petitioner has failed to plead anything suggesting that he suffered prejudice. Petitioner is therefore not entitled to relief on Ground Three.

Accordingly, it is hereby

**ORDERED:**

1. Petitioner Brandon Hardy's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Civ. Doc. 1) is **DENIED**.

2. The Clerk shall enter judgment in favor of the United States and against Brandon Hardy, and close the file.

### CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue… only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Petitioner has not made the requisite showing in these circumstances. Because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal

in forma pauperis.

       **DONE AND ORDERED** at Jacksonville, Florida this 12th day of April, 2017.


TIMOTHY J. CORRIGAN
United States District Judge


lc 19

Copies:

Counsel of record
Petitioner Brandon Hardy